Edward E. Yates, Esq.  SB#135138
Law Office of Edward E. Yates
2060 Sutter Street, #403
San Francisco, CA 94115
Telephone:  (415) 990-4805
Email:  eyates@marinlandlaw.com


Adam D. Brumm, Esq.  SB#257906
Eden Environmental Defenders
1520 E. Covell Blvd, Suite B5-611
Davis, CA  95616
Telephone: (800) 545-7215, Extension 906
Email:  adam@edendefenders.org


Attorneys for Plaintiff
CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS, LLC, a California limited liability company, <br><br> Plaintiff, <br><br> vs. <br><br> CHAMPION HOME BUILDERS, INC., a Delaware corporation domiciled in Michigan doing business in California; SKYLINE CHAMPION CORPORATION, an Indiana corporation domiciled in Michigan formerly known as SKYLINE CORPORATION; and DOES 1-10, inclusive, <br><br> Defendants. | Case No.:  2:23−CV−01273−DJC−DB <br><br> **FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, CIVIL PENALTIES AND REMEDIATION** <br><br> **(Federal Water Pollution Control Act, 33 U.S.C. §§1251 et seq.)** |

FIRST AMENDED COMPLAINT – Page 1

Plaintiff CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS, LLC ("EDEN" or "Plaintiff") hereby brings this civil action pursuant to the Federal Water Pollution Control Act, also known as the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq*.

## INTRODUCTION

1.      This action is a citizen suit for injunctive relief, declaratory relief, civil penalties, and remediation against Defendants CHAMPION HOME BUILDERS and SKYLINE CHAMPION CORPORATION ("Defendants") for current and ongoing violations of the National Pollutant Discharge Elimination System ("NPDES") permit requirements of the CWA.

2.      On or about February 17, 2023, EDEN provided a Notice of Defendants' violations of the CWA to the (1) Administrator of the United States Environmental Protection Agency ("EPA"), (2) EPA's Regional Administrator for Region Nine, (3) Executive Director of the State Water Resources Control Board ("State Board") and (4) to Defendants, including a copy delivered to the facility Manager of Defendants Champion Home Builders, by certified mail, at 1720 East Beamer Street, Woodland, California ("the Facility"), as required by the CWA. 33 U.S.C. § 1365(b)(1)(A).

3.      A copy of EDEN's Notice of Intent to Sue ("Notice") is attached hereto as **Exhibit A** and is incorporated herein by reference.

4.      More than sixty days have passed since EDEN's Notice was properly and lawfully served on Defendants, the State Board, and the Regional and National EPA Administrators.  EDEN is informed and believes, and thereupon alleges, that neither the National EPA, nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. This action's claim for civil penalties is not

barred by any prior administrative penalty under section 309(g) of the CWA, 33 U.S.C. § 1319(g).

## JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. section 1331 (federal question), and 33 U.S.C. section 1365(a) (CWA citizen suit jurisdiction). The relief requested is authorized pursuant to 28 U.S.C. sections 2201-2202 (declaratory relief), 33 U.S.C. sections 1319(b), 1365(a) (injunctive relief), and 33 U.S.C. sections 1319(d), 1365(a) (civil penalties).

6.      The Permit under which this case arises is a Federally required permit based upon California state substantive law.  (*Southern California Alliance of Publicly Owned Treatment Works v. U.S. Environmental Protection Agency* (9th Cir. 2017), 853 F.3d 1076; *Dept. of Finance v. Commission on State Mandates,* 1 Cal.5th 749 (2016))

7.      By its express language, a violation of the State permit constitutes a per se violation of the Federal Clean Water Act.  (California's Industrial General Permit Order 2014-0057 DWQ, NPDES Order No. CAS000001, Section XXI.A)

8.      Venue is proper because Defendant Champion Home Builders, Inc. resides in and the events or omissions giving rise to EDEN's claims occurred in this District. 28 U.S.C. §1391(b)(1), (2). Venue is also proper because the facility's CWA violations have occurred and are occurring within the District. 33 U.S.C. § 1365(c)(1).

## PARTIES

9.      Plaintiff CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS, LLC is an environmental membership group organized under the laws of the State of California.

10.     EDEN's organizational purpose is the protection, preservation and enhancement of the rivers, creeks, streams, lakes and oceans (and their tributaries) located in California.

11.     EDEN's organizational purpose and mission is accomplished through enforcement of the provisions of the Federal Clean Water Act and California's Industrial General Permit, in seeking redress against Industrial Dischargers who violate the Clean Water Act by failing to comply with all standard conditions of the Industrial General Permit.  These standard conditions include, but are not limited to, discharges of polluted stormwater in violation of Federal and California criteria, deficient Stormwater Pollution Prevention Plans and Site Maps, deficient stormwater monitoring and sampling programs/protocols and reporting, deficient best management practices, deficient or non-existing exceedance response action reports, deficient or non-existing employee stormwater training programs, deficient or non-existing annual reports and other informational deficiencies.

12.     EDEN's associational members volunteer their resources to join EDEN's organizational purpose and mission.

13.     EDEN has associational members throughout Northern California.  Some of EDEN's members reside, work and/or recreate near the Sacramento River, a tributary of the Sacramento-San Joaquin River Delta Waterways (the "Receiving Waters" for Defendants' storm water run-off), and use those waters and their watersheds for kayaking, canoeing, camping, cycling, recreation, sports, fishing, swimming, hiking, bird watching, photography, nature walks and scientific study.  Their use and enjoyment of these natural resources have been and continue to be adversely impaired by Defendants' failure to comply with the procedural and substantive requirements of the California Industrial General Permit and Federal Clean Water Act.

14.     EDEN has Article III standing as an association to bring this suit against Defendants, as at least one of EDEN's current members is experiencing an ongoing, concrete and particularized injury fairly traceable to Defendants' violations of the Clean Water Act and Industrial General Permit, which likely can be redressed by a judicial decision granting EDEN the injunctive relief requested herein.

15.     Specifically, the aesthetic and recreational interests of the individual associational members of EDEN with Article III standing have been adversely impacted by Defendants' failure to comply with the procedural and substantive requirements of the California Industrial General Permit and Federal Clean Water Act, as delineated herein.

16.     In addition to harming the aesthetic and recreational interests of EDEN's members with standing in this matter, Defendants' procedural violations of the standard conditions of California's Industrial General Permit have caused informational injuries to EDEN's standing members by depriving these members of their substantive constitutional and statutory rights to obtain information regarding Defendants' compliance with standard conditions of California's Industrial General Permit as delineated herein, which provisions have been instituted by relevant regulatory agencies for the purposes of protecting the Waters of the United States.

17.     EDEN's associational members who qualify for standing in this matter are current members who have been members of EDEN since at least the date that EDEN provided to Defendants the 60-day Notice of Intent to Sue attached hereto as **Exhibit A.**

18.     Defendants' ongoing violations of the General Permit and the Clean Water Act have and will continue to cause irreparable harm to EDEN and its current standing members.

19.     The relief requested herein will redress the ongoing injury in fact to EDEN and its members.

20.     Neither litigation of the claims asserted, nor the relief requested in this Complaint, will require the participation in this lawsuit of any individual members of EDEN.

21.     EDEN is informed and believes, and on such information and belief alleges, that Defendant CHAMPION HOME BUILDERS, INC. with its principal offices located at 755 W. Big Beaver, Suite 1000, Troy, Michigan, is a for-profit corporation formed in Delaware on January 21, 2010, which registered on March 22, 2010, with the California Secretary of State to do business in California.

22.     EDEN is informed and believes, and on such information and belief alleges, that Defendant CHAMPION HOME BUILDERS, INC. is identified in the Regional Water Board's records as the Facility located at 1720 East Beamer Street, Woodland, California, which is covered by the Industrial General Permit, and which is the subject of this litigation.

23.     EDEN is informed and believes, and on such information and belief alleges, that Defendant SKYLINE CHAMPION CORPORATION, with its principal headquarters located at 755 W. Big Beaver, Suite 1000, Troy, Michigan, is a for-profit corporation traded on the New York Stock Exchange as SKY.

24.     EDEN is informed and believes, and on such information and belief alleges that Defendant SKYLINE CHAMPION CORPORATION was originally formed in the state of Indiana on May 29, 1959, under the name of Skyline Corporation.

25.     EDEN is informed and believes, and on such information and belief alleges that on May 30, 2018, Skyline Corporation filed with the Indiana Secretary of State a Certificate of Restatement and Articles of Restatement which certified that effective June 1, 2018, the name of

the entity previously known as "Skyline Corporation" would be amended to "Skyline Champion Corporation."

26.     EDEN is informed and believes, and on such information and belief alleges, that since October 1, 2018, Defendant SKYLINE CHAMPION CORPORATION has been identified under the pseudonym of "Skyline Corp" in the Regional Water Board's records as the owner and operator of Defendant CHAMPION HOME BUILDERS, INC.'s Facility located at 1720 East Beamer Street, Woodland, California.

27.     EDEN is informed and believes, and on such information and belief alleges, that Defendant CHAMPION HOME BUILDERS, INC. has been wholly owned by Defendant SKYLINE CHAMPION CORPORATION since at least June 1, 2018.

## STATUTORY BACKGROUND

28.     Congress declared that the Federal Clean Water Act was designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters" through federal and state cooperation to develop and implement "programs for preventing, reducing, or eliminating the pollution of navigable waters and ground waters." 33 U.S.C. §§ 1251(a), 1252(a).

29.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

30.     Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p). States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm

water discharges through individual permits issued to dischargers or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342(p).

31.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Water Resources Control Board ("Water Board") to issue NPDES permits, including general NPDES permits in California.

General Permit

32.     The State Board elected to issue a statewide general permit for industrial storm water discharges. The State Board originally issued the General Permit on November 19, 1991, and modified it on September 17, 1992.   The State Board reissued the General Permit on April 17, 1997, and again on April 1, 2014 (the "2015 Permit" or "General Permit"), pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p). The 1997 Permit was in effect between 1997 and June 30, 2015.  The 2015 Permit went into effect on July 1, 2015.  The 2015 Permit maintains or makes more stringent the same requirements as the 1997 Permit.

33.     On November 16, 2018, the State Water Board adopted a revised General Permit (Order No. 2018-XXXX-DWQ, which technically became effective on July 1, 2020.  However, the 2018 Revisions have not officially been finalized or certified by the Clerk of the State Water Board as of the date of this Complaint.

34.     In order to discharge storm water lawfully in California, all industrial facilities discharging, or having the potential to discharge, storm water associated with industrial activity ("Dischargers") which have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent to Comply ("NOI").  Dischargers have been required to file NOIs since March 30, 1992.

35.     The specific industrial facilities required to apply for General Permit coverage are identified on Attachment A to the General Permit.

36.     The General Permit contains several prohibitions. Effluent Limitation V(A) of the General Permit requires Dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.  Discharge Prohibition III(C) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

37.     Receiving Water Limitation VI(B) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment. Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

38.     In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that Dischargers must meet.

39.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP"). The SWPPP must describe storm water control facilities and measures that comply with the BAT and BCT standards.  The objective of the SWPPP requirement is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges and authorized non-stormwater discharges from the facility, and to implement best management practices ("BMPs") to reduce or prevent pollutants

associated with industrial activities in storm water discharges and authorized non-storm water discharges. General Permit, § X(C). These BMPs must achieve compliance with the General Permit's effluent limitations and receiving water limitations, including the BAT and BCT technology mandates.

40.     To ensure compliance with the General Permit, the SWPPP must be evaluated and revised as necessary. General Permit, § X(B).

41.     Failure to develop or implement an adequate SWPPP, or to update or revise an existing SWPPP as required, is a violation of the General Permit. General Permit, Fact Sheet §I(1).

42.     Sections X(D) – X(I) of General Permit set forth the requirements for a SWPPP. Among other requirements, the SWPPP must include: a pollution prevention team; a site map; a list of significant materials handled and stored at the site; a description of potential pollutant sources; an assessment of potential pollutant sources; and a description of a specific mandatory set of minimum BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-stormwater discharges.

43.     The General Permit further requires dischargers to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial storm water discharges: exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs.  General Permit, § X(H)(2).  Failure to implement advanced BMPs as necessary to achieve compliance with either technology or water quality standards is a violation of the General Permit.

44.     The General Permit also requires that the SWPPP include BMP Descriptions and a BMP Summary Table.  General Permit, § X(H)(4), (5).

45.     The General Permit requires Dischargers to develop and implement an adequate written Monitoring and Reporting Program.  The primary objective of the Monitoring and Reporting Program is to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the General Permit's discharge prohibitions, effluent limitations, and receiving water limitations.

46.     As part of their monitoring program, Dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented.

47.     Section XI(B) of the General Permit requires that Dischargers collect and analyze storm water samples from two qualifying storm events ("QSEs") during the first half of each reporting year (July 1 to December 31) and two QSEs during the second half of each reporting year (January 1 to June 30), and that the samples be collected from all outfalls identified in the facility SWPPP.

48.     A QSE is a precipitation event that produces a discharge for at least one drainage area and is preceded by 48 hours with no discharge from any drainage area.  General Permit §XI(B)(2)

49.     Once the storm water samples have been collected, the General Permit requires that the Discharger deliver the samples to a qualified laboratory for analysis within 48 hours of collection (General Permit, Attachment H) and upload into SMARTS the resulting laboratory reports within 30 days from receipt of the report.  General Permit § XI(B)(4)

50.     Facilities are also required to make monthly visual observations of storm water discharges. The visual observations must represent the quality and quantity of the facility's storm water discharges from the storm event.  General Permit, § XI(A)

51.     The General Permit requires operators to conduct an Annual Comprehensive facility Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of current BMPs and the need for additional BMPs based on visual observations and sampling and analysis results. General Permit, § XV.

52.     Under the General Permit, facilities must analyze storm water samples for pH, oil & grease and total suspended solids, as well as additional parameters indicated in the Permit by facility type and those parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment.  General Permit, § XI(B)(6)(c).

53.     The US EPA has established Parameter Benchmark Values as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT. These benchmarks represent pollutant concentrations at which a storm water discharge could potentially impair, or contribute to impairing, water quality, or affect human health from ingestion of water or fish.

54.     The Numeric Action Levels ("NALs") in the General Permit are derived from these benchmarks. The Permit incorporates annual NALs, which are derived from the 2008 MSGP benchmark values, and instantaneous maximum NALs, which are derived from a Water Board dataset.

55.     The following annual NALs have been established under the General Permit for pollution parameters applicable to all Dischargers: pH – 6.0 - 9.0 standard units ("S.U."); total

suspended solids ("TSS") – 100 mg/L; oil & grease ("O&G") – 15 mg/L; iron – 1.0 mg/L, nitrite + nitrate as nitrogen --.68 mg/L, zinc --.26 mg/L, phosphorus --2.0 mg/L, aluminum – .75 mg/L, lead – .262 mg/L, copper – .0332 mg/L, nickel – 1.02 mg/L and chemical oxygen demand – 120 mg/L.

56.     An exceedance of an annual NAL occurs when the average of all samples obtained for an entire facility during a single reporting year is greater than a particular annual NAL. The reporting year runs from July 1 to June 30.  An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value (for TSS and O&G) or are outside of the instantaneous maximum NAL range for pH.  General Permit §XII(A)

57.     When a Discharger exceeds an applicable NAL, it is elevated to "Level 1 Status," which requires a revision of the SWPPP and additional BMPs. If a discharger exceeds an applicable NAL during Level 1 Status, it is then elevated to "Level 2 Status."  General Permit § XII(C)

58.     For Level 2 Status, a Discharger is required to submit an Action Plan requiring a demonstration of either additional BMPs to prevent exceedances, a determination that the exceedance is solely due to non-industrial pollutant sources, or a determination that the exceedance is solely due to the presence of the pollutant in the natural background.  General Permit §XII(D)

59.     The Water Board has established an online database referred to as its Stormwater Multiple Application and Tracking System (SMARTS").  SMARTS is a platform where Dischargers, regulators, and the public can enter, manage, and view storm water data associated with General Permit compliance.

60.     The General Permit requires Dischargers to upload to SMARTS all Permit Registration Documents, including SWPPPs and Site Maps, monitoring and sampling data and Annual Reports.

61.     Section XVI(A) of the General Permit requires that all Dischargers must certify and submit to SMARTS an Annual Report no later than July 15th following each reporting year using the standardized format and checklists in SMARTS.

62.     Furthermore, Section XXI(L) of the General Permit provides that all documents submitted to SMARTS, including SWPPPs and Annual Reports, be certified by a legally responsible party or duly authorized representative of the facility, with the following certification:

> "I certify under penalty of law that this document and all Attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system or those persons directly responsible for gathering the information, to the best of my knowledge and belief, the information submitted is, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

63.     Section XXI(N) of the General Permit provides that any person who knowingly makes any false material statement, representation, or certification in any record or other document submitted or required to be maintained under the General Permit, including reports of compliance or noncompliance shall upon conviction, be punished by a fine of not more than $10,000, or by imprisonment for not more than two years, or by both.  *See* also Clean Water Act section 309(c)(4)

Central Valley Region Basin Plan

64.     The Regional Board has identified beneficial uses of the Central Valley Region's waters and established water quality standards for the Sacramento River and its tributaries and

FIRST AMENDED COMPLAINT – Page 14

the Sacramento-San Joaquin Delta in "The Water Quality Control Plan (Basin Plan) for the California Regional Water Quality Control Board, Central Valley Region – *The Sacramento River Basin and The San Joaquin River Basin*," generally referred to as the Basin Plan, and the "Water Quality Control Plan for the San Francisco Bay/Sacramento-San Joaquin Delta Estuary."

65.     The beneficial uses of these waters include, among others, domestic and municipal supply, water contact recreation, non-contact water recreation, wildlife habitat, warm and cold freshwater habitat, and fish spawning. The non-contact water recreation use is defined as "uses of water for recreational activities involving proximity to water, but where there is generally no body contact with water, nor any likelihood of ingestion of water. These uses include, but are not limited to, picnicking, sunbathing, hiking, camping, boating. . . hunting, sightseeing, or aesthetic enjoyment in conjunction with the above activities."

66.     The Basin Plan includes a narrative toxicity standard which states that all waters shall be maintained free of toxic substances in concentrations that produce detrimental physiological responses in human, plant, animal, or aquatic life.

67.     The Basin Plan provides that water shall not contain floating material in amounts that cause nuisance or adversely affect beneficial uses.

68.     The Basin Plan provides that water shall be free of discoloration that causes nuisance or adversely affects beneficial uses.

69.     The Basin Plan provides that waters shall not contain suspended materials in concentrations that cause nuisance or adversely affect beneficial uses.

70.     The Basin Plan also prohibits the discharges of oil and grease, stating that waters shall not contain oils, greases, waxes, or other materials in concentrations that cause nuisance,

result in a visible film or coating on the surface of the water or on objects in the water, or otherwise adversely affect beneficial uses.

71.    The Basin Plan provides that at a minimum, water designated for use as domestic or municipal supply (MUN) shall not contain concentrations of chemical constituents in excess of the maximum contaminant levels (MCLs) specified in the following provisions of Title 22 of the California Code of Regulations, which are incorporated by reference into this plan: Tables 64431-A (Inorganic Chemicals) and 64431-B (Fluoride) of Section 64431, Table 64444-A (Organic Chemicals) of Section 64444, and Tables 64449-A (Secondary Maximum Contaminant Levels-Consumer Acceptance Limits) and 64449-B (Secondary Maximum Contaminant Levels-Ranges) of Section 64449.

72.    Title 22 of the California Code of Regulations provides a MCL for aluminum of 1.0 mg/L, for Cadmium of .01 mg/L, and lead of .05 mg/L.

73.    The Basin Plan provides that the pH shall not be depressed below 6.5 nor raised above 8.5; that iron levels not exceed .30 mg/L; that zinc not exceed .10 mg/L; that copper not exceed .0056 mg/L, and that cadmium not exceed .00022 mg/L.

74.    The Basin Plan requires that waters shall be free of changes in turbidity that cause nuisance or adversely affect beneficial uses."

75.    Table III-1 of the Basin Plan provides a water quality objective ("WQO") for iron of 0.3 mg/L.

Citizen Suit Provision of the CWA

76.    Under the CWA, any citizen may commence a civil action against any person who is alleged to be in violation of an effluent standard or limitation under the CWA or an Order issued by a State with respect to such a standard or limitation." 33 U.S.C. §1365(a)(1). No action

may be commenced prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the Administrator of the EPA, (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order." 33 U.S.C. § 1365(b)(1)(A).  By including a citizen suit provision in the CWA, Congress ensured that the purposes and requirements of the CWA would be enforced, either by the United States government or by concerned citizens.

77.     In furtherance of the water preservation goals established by the CWA, the citizen suit provision confirms the district court's jurisdiction to apply any appropriate civil penalties under section 1319(d).  33 U.S.C. § 1365(a). Section 1319(d) declares that any person who violates any permit condition or limitation implementing any of such sections in an NPDES permit shall be subject to a civil penalty not to exceed $46,192.00 per day for each violation occurring before November 2, 2015, and $56,460.00 per day per violation for violations occurring after November 2, 2015.   33 U.S.C. § 1319(d); 40 C.F.R. § 19.4; General Permit XXI.Q.1.

78.     Violations of provisions of the General Permit, including those detailed below, constitute violations of the CWA and are subject to civil penalties. General Permit § XXI; 33 U.S.C. §§ 1319(d), 1342; 40 C.F.R. §§ 19.1-19.4.

**FACTUAL ALLEGATIONS WHICH GIVE RISE TO CLAIMS**

79.     Defendant CHAMPION HOME BUILDERS  is a facility which manufactures modular homes and buildings.  EDEN is informed and believes that the facility falls under standard industrial classification ("SIC") code 2451.

80.     EDEN is informed and believes that Defendants store vast amounts industrial materials outdoors that are exposed to storm water, eroded by wind, and otherwise contaminate the surrounding watershed.

81.     Plaintiff is informed and believes, and thereupon alleges that during rain events, storm water flows over the surface of the facility where industrial activities occur and areas where airborne materials associated with the industrial processes at the facility may settle onto the ground.   Plaintiff is informed and believes, and thereupon alleges that storm water flowing over these areas collects suspended sediment, dirt, metals, and other pollutants as it flows towards the facility's storm water channels.

82.     Based on EDEN's investigation, including a review of the Defendants' Notice of Intent to Comply with the Terms of the Industrial General Permit ("NOI"), SWPPP, aerial photography, Federal, State and local regulatory agency mapping tools and EDEN's information and belief, storm water leaves the boundaries of Defendants' facility and enters Tule Canal and Lower Cache Creek before entering the Sacramento River, a navigable Water of the United States.

83.     Plaintiff is informed and believes, and thereupon alleges, that the best management practices at the facility are currently inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States.

Deficient SWPPP/Failure to Follow SWPPP

84.     On information and belief, Plaintiff alleges that since at least May 1, 2018, Defendants have failed to implement an adequate SWPPP for its facility.

FIRST AMENDED COMPLAINT – Page 18

85.     Plaintiff is informed and believes, and thereupon alleges, that Defendants' SWPPP and Site Map do not include each of the mandatory elements required by Section X of the General Permit, as is more particularly described in the Notice Letter attached hereto as **Exhibit A**.

86.     Plaintiff is informed and believes, and thereupon alleges, that Defendants' SWPPP and Site Map do not include sufficient information to comply with the mandatory elements required by Section X of the General Permit, as is more particularly described in the Notice Letter attached hereto as **Exhibit A**.

87.     According to information available to EDEN, Defendants' SWPPP has not been evaluated to ensure its effectiveness and revised where necessary to further reduce pollutant discharges.

88.     Plaintiff is informed and believes, and thereupon alleges, that Defendants' SWPPP does not set forth site-specific Best Management Practices (BMPs) for the facility that are consistent with BAT or BCT.

89.     Plaintiff is informed and believes, and thereupon alleges, that Defendants have failed and continues to fail to alter the facility's SWPPP and site-specific BMPs consistent with the General Permit.

90.     In addition, Plaintiff alleges that Defendants have failed to comply with the provisions of the facility's current SWPPP in the areas of monitoring and reporting.

91.     Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events into the Sacramento River.

92.     Plaintiff notes that on May 25, 2023, Defendants' uploaded a revised SWPPP to SMARTS.  However, the revised SWPPP is also deficient and does not comply with all mandatory elements of Section X of the General Permit.

93.     Plaintiff is informed and believes, and thereupon alleges, that all the violations alleged above with respect to Defendants' deficient SWPPP are ongoing and continuing.

Monitoring and Reporting

94.     On information and belief, EDEN alleges that Defendants have an inadequate monitoring program at the CHAMPION HOME BUILDERS' facility.

95.     On information and belief, EDEN alleges that since May 1, 2018, Defendants have failed to collect and analyze two storm water samples from the first half of each reporting year, and two storm water samples from the second half of each reporting year, as required by General Permit §XI(B).

96.     On information and belief, EDEN alleges that Defendants have failed to conduct monthly visual observations of storm water discharges at the facility since at least May 1, 2018.

97.     On information and belief, EDEN alleges that Defendant have collected samples of storm water discharges at the facility that failed to comply with the General Permit's requirement that samples be preceded by a 48-hour period without a discharge, as is more particularly described in the Notice Letter attached hereto as **Exhibit A**.

98.     EDEN is informed and believes that Defendants has failed to analyze the facility's storm water samples for the required parameters, in violation of Section XI(B)(6) of the General Permit, as is more particularly described in the Notice Letter attached hereto as **Exhibit A**.

99.     On information and belief, EDEN alleges that Defendants have failed to deliver the facility storm water samples to a qualified Laboratory within 48 hours of collection, pursuant

to Attachment H, Section 2 of the General Permit, as is more particularly described in the Notice Letter attached hereto as **Exhibit A**.

<u>Falsification of Annual Reports</u>

100.    EDEN is informed and believes that since May 1, 2018, Defendants have submitted inaccurate and/or falsified Annual Reports to the Regional Water Quality Control Board in violation of Sections XXI(L) and XXI(N) of the General Permit, as is more particularly described in the Notice Letter attached hereto as **Exhibit A**.

<u>Incomplete Ad Hoc Monitoring Reporting</u>

101.    EDEN is informed and believes that since May 1, 2018, Defendants have failed to submit complete Ad Hoc Monitoring Reports to the Regional Water Quality Control Board in violation of Sections XI of the General Permit, as is more particularly described in the Notice Letter attached hereto as **Exhibit A**.

<u>Failure to Implement BAT/BCT and BMPs</u>

102.    EDEN is informed and believes that since at least May 1, 2018, Defendants have failed to identify and implement Best Management Practices ("BMPs") at its facility which comply with the requirements of the General Permit for best conventional treatment (BCT) for conventional pollutants, and best available technology (BAT) for toxic and non-conventional pollutants. These technology-based pollution controls are required to be implemented in a manner that reflects best industry practice considering technological availability and economic practicability and achievability.  General Permit §§ I(C), V(A).

103.    Defendants' BMP deficiencies are more particularly described in the Notice Letter attached hereto as **Exhibit A**.

104.    As further evidence of Defendants' BMP deficiencies, Plaintiff has attached hereto as **Exhibit B** photographs of Defendant CHAMPION HOME BUILDERS' facility as of February 5, 2023.

105.    Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events from the facility to the Sacramento River.

Discharges of Contaminated Storm Water

106.    Information available to EDEN indicates that unauthorized non-storm water discharges occur at the facility due to inadequate BMP development and/or implementation necessary to prevent these discharges, as is more particularly described in the Notice Letter attached hereto as **Exhibit A**.

107.    Due to the nature of the operations at the facility, coupled with the documented lack of proper BMP implementation and unauthorized non-storm water discharges, Defendants are discharging storm water containing excessive levels of pollutants specific to its operation during at least every significant local rain event.

Failure to Comply with Required Exceedance Response Actions

108.    On July 1, 2017, Defendants was elevated to Level 1 Status for exceedances of Total Suspended Solids which occurred during the 2016-17 reporting year.

109.    Pursuant to Section XII of the General Permit, Defendants' Level 1 ERA Report was due to be prepared and uploaded into SMARTS by January 1, 2018.

110.    To date, Defendants has failed to submit a Level 1 ERA Report.

Failure to Train Employees

111.    The General Permit requires all Dischargers to designate a Legally Responsible Person to implement the requirements of the Permit.  The Legally Responsible Person is responsible for appointing a Pollution Prevention Team and ensuring that the Team is properly trained in at least the following minimum requirements: BMP implementation, BMP effectiveness evaluations, visual observations, and monitoring activities.

112.    Plaintiff is informed and believes that since at least May 1, 2018, Defendants Champion Home Builders has failed to implement and train a Pollution Prevention Team at its facility.

## FIRST CAUSE OF ACTION
### Failure to Prepare, Implement, Review, and Update
### an Adequate Storm Water Pollution Prevention Plan
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

113.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

114.    The General Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP.

115.    As outlined herein, Defendants have failed to develop and implement an adequate SWPPP for the facility.

116.    Each day since May 1, 2018, that Defendants have failed to develop, implement and update an adequate SWPPP for the facility is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a). These violations are ongoing and continuous.

## SECOND CAUSE OF ACTION
### Failure to Develop and Implement an
### Adequate Monitoring and Reporting Program
### (Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

117.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

118.    The General Permit requires dischargers of storm water associated with industrial activity to have developed and be implementing a monitoring and reporting program (including sampling and analysis of discharges) that complies with the terms of the General Permit.

119.    As outlined herein, Defendants have failed to develop and implement an adequate monitoring and reporting program for the facility.

120.    Each day since at least May 1, 2018, that Defendants have failed to develop and implement an adequate monitoring and reporting program for the facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a). The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Act.

### THIRD CAUSE OF ACTION
**Submission of False and Incomplete Annual Reports to the Regional Water Board**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

121.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

122.    Section XVI of the General Permit requires that Annual Reports submitted to SMARTS be certified under penalty of law, pursuant to General Permit Section XXI(L), which provides significant penalties for submitting false information.

123.     Specifically, Clean Water Action section 309(c)(4) and Section XXI(N) of the General Permit provide a maximum penalty to any person who knowingly makes a false material statement, representation or certification in any record or other documents submitted or required to be maintained under the General Permit, including Annual Reports, up to and including a fine of $10,000 and imprisonment of two years, or both.

124.     As delineated herein, Defendants made false representations in the facility's Annual Reports.

125.     Furthermore, Defendants have submitted incomplete Annual Reports and Ad Hoc Monitoring Reports, in violation of General Permit Sections XI.B and XVI.

126.     Each time since May 1, 2018, that Defendants submitted false or misleading statements to the Water Board under penalty of perjury is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These violations are ongoing and continuous.

**FOURTH CAUSE OF ACTION**
**Failure to Implement the Best Available and**
**Best Conventional Treatment Technologies**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

127.     Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

128.     The General Permit's SWPPP requirements and Effluent Limitation V(A) of the General Permit require dischargers to reduce or prevent pollutants in their storm water

discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.

129.    As alleged herein, Defendants have failed to implement BAT and BCT at the facility for its discharges of pollutants, in violation of Effluent Limitation V(A) of the General Permit.

130.    Each day since at least May 1, 2018, that Defendants have failed to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These violations are ongoing and continuous.

**FIFTH CAUSE OF ACTION**
**Discharges of Contaminated Storm Water**
**in Violation of Permit Conditions and the Act**
**(Violations of 33 U.S.C. §§ 1311, 1342)**

131.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

132.    Discharge Prohibition III(C) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water VI(B) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment. Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

133.    Plaintiff is informed and believes, and thereupon alleges, that since at least May 1, 2018, Defendants have been discharging polluted storm water from its facility, in excess of

applicable water quality standards in violation of Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the General Permit.

134.    During every rain event, storm water flows freely over exposed materials, waste products, and other accumulated pollutants at both facilities, becoming contaminated with pollutants associated with the industrial activity occurring at Defendants' facility.   The polluted storm water then flows untreated into the Sacramento River.

135.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing or contributing to the violation of the applicable water quality standards in a Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of Receiving Water Limitations of the General Permit.

136.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitations of the General Permit.

137.    Every day since at least May 1, 2018, that Defendants have discharged and continues to discharge polluted storm water from its facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These violations are ongoing and continuous.

**SIXTH CAUSE OF ACTION**
**Failure to Comply with Required Exceedance Response Actions**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

138.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

139.     The General Permit requires that all Dischargers who enter Level 1 or Level 2 status comply with specific Exceedance Response Actions delineated in Section XII of the General Permit.

140.     As herein alleged, Defendants have failed to date to comply with the Exceedance Response Actions required of it by the General Permit.

141.     Each day since May 1, 2018, that Defendants have failed to comply with the Exceedance Response Actions required by the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These violations are ongoing and continuous.

## SEVENTH CAUSE OF ACTION
### Failure to Properly Train facility Employees and Pollution Prevention Team
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

142.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

143.     Section X(D)(1) of the General Permit requires each facility to establish a Pollution Prevention Team responsible for implementing the requirements of the General Permit. The facility is also required to identify alternate team members to implement the SWPPP and conduct required monitoring when the regularly assigned Pollution Prevention Team members are temporarily unavailable (due to vacation, illness, out of town business, or other absences).

144.     Section X(H)(f) of the General Permit also requires that each facility ensure that all of its Pollution Prevention Team members implementing the various compliance activities of the General Permit are properly trained.

145.     Since at least May 1, 2018, Defendants have failed to properly implement and train a Pollution Prevention Team, which has resulted in the General Permit violations alleged herein.  These violations are ongoing and continuous.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment providing the following relief:

1.     Declare Defendants to have violated and to be in violation of the CWA;

2.     Issue an injunction ordering Defendants to immediately operate the CHAMPION HOME BUILDERS' facility in compliance with the NPDES permitting requirements contained in the General Permit and the CWA;

3.     Enjoin Defendants from discharging pollutants to the surface waters surrounding its facility until such time as Defendants have developed and implemented an adequate SWPPP and implemented appropriate BMPs;

4.     Order Defendants to pay civil penalties of $56,460.00 per day/per violation for each violation of the Act pursuant to 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1, 19.2-19.4;

5.     Order Defendants to take appropriate actions to restore the quality of United States waters impaired by activities at its facility;

6.     Order Defendants to pay EDEN's reasonable attorneys' fees and costs (including expert witness fees), as provided by 33 U.S.C. § 1365(d) and applicable California law; and

8.      Award such other and further relief as may be just and proper.

Dated:  November 2, 2023                          Respectfully,


By: ___*/S/_Edward E. Yates*_____
    Edward E. Yates
    Attorney for Plaintiff

# EXHIBIT A



# EDEN

## *Central Valley* Eden Environmental Defenders

February 16, 2023

<u>Via US Mail, Certified and Email</u>

David Whiddon        Email:  <u>dwhiddon@skylinehomes.com</u>
Facility Manager
Champion Home Builders
1720 East Beamer Street
Woodland, CA 95776

<u>Via US Mail</u>

C T Corporation System
Agent for Champion Home Builders, Inc.
330 N. Brand Blvd Suite 700
Glendale, CA  91203

Tom Snudden        Email:  <u>tsudden@championhomes.com</u>
Skyline Champion Corporation
755 West Big Beaver Road, Suite 1000
Troy, MI  48084

**Re:**    **60-Day Notice of Violations and Intent to File Suit Under the Federal Water Pollution Control Act ("Clean Water Act")**

To Officers, Directors, Operators, Property Owners and/or Facility Managers of Champion Home Builders, Inc.:

This letter is being sent to you on behalf of Central Valley Eden Environmental Defenders, LLC ("EDEN") to give legal notice that EDEN intends to file a civil action against Skyline Champion Corporation and Champion Home Builders, Inc. ("Discharger" or "Champion Home Builders") and the respective corporate officers and other legally responsible parties for violations of the Federal Clean Water Act ("CWA" or "Act") 33 U.S.C. § 1251 *et seq.,* that EDEN believes are occurring at the Champion Home Builders facility located at 1720 East Beamer Street in Woodland, California ("the Facility" or "the site").

---

1520 E. Covell Blvd #B5        Telephone:  (800) 545-7215
Davis, CA  95616        Email:  <u>admin@edendefenders.org</u>

EDEN is an environmental citizen's group established under the laws of the State of California to protect, enhance, and assist in the restoration of all rivers, creeks, streams, sloughs, lakes and tributaries of California, for the benefit of its ecosystems and communities.

As discussed below, the Facility's discharges of pollutants degrade water quality and harm aquatic life in the Facility's Receiving Waters, which are waters of the United States and are described in Section II.B, below. EDEN has members throughout California. Some of EDEN's members live, work, and/or recreate near the Receiving Waters and use and enjoy the Receiving Waters for kayaking, canoeing, camping, fishing, duck hunting, boating, swimming, hiking, cycling, bird watching, picnicking, viewing wildlife, and/or engaging in scientific study.

At least one of EDEN's current members has standing to bring suit against Champion Home Builders, as the unlawful discharge of pollutants from the Facility as alleged herein has had an adverse effect particular to him or her and has resulted in actual harm to the specific EDEN member(s).

Further, the Facility's discharges of polluted storm water and non-storm water are ongoing and continuous. As a result, the interests of certain individual EDEN members have been, are being, and will continue to be adversely affected by the failure of Champion Home Builders to comply with the General Permit and the Clean Water Act.

CWA section 505(b) requires that sixty (60) days prior to the initiation of a civil action under CWA section 505(a), a citizen must give notice of intent to file suit. 33 U.S.C. § 1365(b). Notice must be given to the alleged violator, the U.S. Environmental Protection Agency ("EPA"), and the EPA in the state in which the violations occurred or are occurring.

As required by CWA section 505(b), this Notice of Violation and Intent to File Suit provides notice to the Discharger of the violations which have occurred and continue to occur at the Facility. After the expiration of sixty (60) days from the date of this Notice of Violation and Intent to File Suit, EDEN reserves the right to file suit in federal court against Champion Home Builders under CWA section 505(a) for the violations described more fully below, if this matter cannot be resolved.

## I.    THE SPECIFIC STANDARD, LIMITATION OR ORDER VIOLATED

EDEN's investigation of the Facility has uncovered significant, ongoing, and continuous violations of the CWA and the General Industrial Storm Water Permit issued by the State of California (NPDES General Permit No. CAS000001 [State Water Resources Control Board ("SWRCB")] Water Quality Order No. 2014-0057-DWQ as amended by Orders 2015-0122-DWQ and 2018-XXXX-DWQ) (hereinafter "General Permit").

Information available to EDEN, including documents obtained from California EPA's online Storm Water Multiple Application and Reporting Tracking System ("SMARTS"), indicates that on or around March 30, 1992, Champion Home Builders submitted a Notice of Intent ("NOI") to be authorized to discharge storm water from the Facility under the General Permit. Champion Home Builders's assigned Waste Discharger Identification number ("WDID") is 5S57I001960.

As more fully described in Section III, below, EDEN alleges that in its operations of the Facility, Champion Home Builders has committed ongoing violations of the substantive and procedural requirements of the Federal Clean Water Act, California Water Code §13377, et seq; the General Permit; the Regional Water Board Basin Plan; the California Toxics Rule (CTR); 40 C.F.R. Chapter I, Subchapter N, § 400, et seq.; and California Code of Regulations, Title 22, § 64431.

## II.  THE LOCATION OF THE ALLEGED VIOLATIONS

### A.  **The Facility**

The location of the point sources from which the pollutants identified in this Notice are discharged in violation of the CWA is Champion Home Builders's permanent facility address of 1720 East Beamer Street in Woodland, California.

Champion Home Builders is a facility that manufactures modular homes and buildings.  Facility operations are covered under Standard Industrial Classification Code (SIC) 2451 - Manufactured Homes.

Based on the EPA's Industrial Storm Water Fact Sheet for industrial businesses with the SIC code of 2451, stormwater run-off discharges contain many pollutants on the list of chemicals published by the State of California known to cause cancer, birth defects, and/or developmental or reproductive harm, including toxic and heavy metals, pH affecting substances, total suspended solids (TSS), and various types of oil and grease (O&G), as well as COD, Nitrates (N+N), Aluminum, Iron, Chlorine/Chlorinated Acids, Formaldehyde, Sulphates, Ammonia, Calcium, Sytrenes, Total Petroleum Hydrocarbons and PCBs.

Information available to EDEN indicates that the Facility's industrial activities and associated materials are exposed to storm water, and that each of the substances listed on the EPA's Industrial Storm Water Fact Sheet is a potential source of pollutants at the Facility.

### B. The Affected Receiving Waters

The Facility discharges into Lower Cache Creek, a tributary of the Sacramento River ("Receiving Waters"). Cache Cree is impaired for Boron and Mercury.

The Sacramento River is a water of the United States. The CWA requires that water bodies such as the Sacramento River meet water quality objectives that protect specific "beneficial uses." The Regional Water Board has issued its *Water Quality Control Plan for the Sacramento-San Joaquin Delta Basin* ("Basin Plan") to delineate those water quality objectives.

The Basin Plan identifies the "Beneficial Uses" of water bodies in the region. The Beneficial Uses for the Receiving Waters downstream of the Facility include: Municipal and Domestic Supply (MUN), Agricultural Supply (AGR), Industrial Process Supply (PRO), Industrial Service Supply (IND), Navigation (NAV), Water Contact Recreation (REC-1), Non-contact Water Recreation (REC-2), Warm Freshwater Habitat (WARM), Cold Freshwater Habitat (COLD), Wildlife Habitat (WILD), Migration (MIGR), and Spawning, Reproduction, and/or Early Development (SPWN).

A water body is impaired pursuant to section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d), when its Beneficial Uses are not being achieved due to the presence of one or more pollutants. Polluted storm water and non-storm water discharges from industrial facilities, such as the Facility, contribute to the further degradation of already impaired surface waters, and harm aquatic dependent wildlife.

### III. VIOLATIONS OF THE CLEAN WATER ACT AND GENERAL PERMIT

#### A. *Deficient SWPPP and Site Map*

Champion Home Builders's current Storm Water Pollution Prevention Plan ("SWPPP") and Site Map for the Facility are inadequate and fail to comply with the requirements of the General Permit as specified in Section X of Order No. 2014-0057-DWQ, as delineated below.

1. The Site Map does not include the following minimum required components for Site Maps as indicated in Section X.E of the General Permit:

   (a) notes, legends, a north arrow and other data to ensure the map is clear, legible and understandable;

   (b) an accurate depiction of the facility boundary;

   (c) an accurate depiction of storm water drainage areas within the facility boundary and portions of any drainage area impacted by discharges from surrounding areas;

(d)   the accurate flow direction of each drainage area;

(e)   sampling points which are representative of facility operations.

(f)   areas of soil erosion;

(g)   nearby water bodies such as rivers, lakes and creeks;

(h)   locations of storm water collection and conveyance systems associated with discharge locations and the accurate flow direction;

(i)   sample locations if different than the identified discharge locations;

(j)   locations and descriptions of structural control measures that affect industrial storm water discharges, authorized NSWDs and/or run-on;

(k)   identification of all impervious areas of the facility, including paved areas, buildings, covered storage areas or other roofed structures;

(l)   locations where materials are directly exposed to precipitation and the locations where identified significant spills or leaks have occurred; and

(m)   all areas of industrial activity subject to the General Permit.

2.   The SWPPP does not include all the required elements, as indicated below:

(a)   Certification by an eligible **Legally Responsible Person** (LRP).

LRP eligibility is limited to the following individuals:

(1)   A responsible corporate officer (i.e. president, secretary, treasurer or vice-president in charge of a principal business function);

(2)   The Manager of the entire facility or the Manager of manufacturing, production or operations for the facility; or

(3)   A general partner, managing member or facility owner for partnerships, limited liability companies or sole proprietorships.

(b) The facility's **scheduled operating hours**, including irregular operating hours (i.e. temporary, intermittent, seasonal, weather dependent) (Section X.D.2.d);

(c) An appropriate discussion of all **Industrial Materials** handled at the facility, including the locations where the materials are stored, received, shipped and handled, and the quantities and handling frequency of the Industrial Materials (Sections X.A.3, X.F, X.G.1.a);

(d) A detailed, accurate and complete discussion of **Facility operations and all industrial processes** at the Facility, including manufacturing, cleaning, maintenance, recycling, disposal, and any other activities related to each industrial process; and the type, characteristics, and approximate quantity of industrial materials used in or resulting from the process. Areas protected by containment structures and the corresponding containment capacity are also required to be identified and described. (X.G.1.a);

(e) An accurate and complete description of **Potential Pollutant Sources** and narrative assessment of all areas of industrial activity with potential industrial pollutant sources, including Industrial Processes, Material Handling and Storage Areas, Dust and Particulate Generating Activities, Significant Spills and Leaks, Non-Storm Water Discharges and Erodible Surfaces (Section X.G);

(f) Adequate mandatory **Minimum Best Management Practices** (BMPs), including Good Housekeeping, Preventive Maintenance, Spill and Leak Prevention and Response, Material Handling and Waste Management, Erosion and Sediment Controls, Employee Training Program and Quality Assurance and Record Keeping (Section X.H.1);

(g) Adequate **Advanced BMP**s required to comply with the Best Available Technology ("BAT") and Best Conventional Pollutant Control Technology ("BCT") requirements of the General Permit to reduce or prevent discharges of pollutants in the Facility's storm water discharge in a manner that reflects best industry practice, considering technological availability and economic practicability and achievability, including Exposure Minimization BMPs, Storm Water Containment and Discharge Reduction BMPs or Treatment Control BMPs (Section X.H.2);

(h) A **BMP Summary Table** summarizing each identified area of industrial activity, the associated industrial pollutant sources, the industrial pollutants and the BMPs being implemented (Section X.H.4 and X.H.5);

(i)   An identification of all **Non-Storm Water Discharges** (**NSWD**s) sources and drainage areas, including an evaluation of all drains (inlets and outlets) that identifies connections to the storm water conveyance system, and a description of how all unauthorized NSWDs have been eliminated (Section X.G.e);

(j)   An appropriate **Monitoring Implementation Plan**, including **an identification of team members assigned to conduct monitoring requirements**, a detailed and accurate description of all discharge locations, a discussion of Visual Observation procedures, justifications for alternative discharge locations, if any, procedures for field instrument calibration instructions, and an example Chain of Custody form to be used when handling and shipping water quality samples to the lab (Section X.I);

(k)   An adequate and accurate discussion of the **Facility's Receiving Waters.** (Section XI.B.6.e, Section X.G.2.ix);

(l)   The proper **sampling parameters** for the Facility's SIC Code; specifically, COD (Section XI.B.6.d, Table 1, Section XI));

(m)   An adequate pollutant source assessment and the corresponding proper **sampling parameters** to include all potential pollutants present at the facility likely to come into contact with stormwater (Section XI.B.6).

The SWPPP includes as Potential Pollutants present in industrial operations at the facility: Pollutants associated with industrial paints and coatings, Nitrates, Aluminum and Iron (associated with sheet metal), Chlorine/Chlorinated Acids, Formaldehyde, Sulphates, Ammonia, Calcium, Sytrenes and Total Petroleum Hydrocarbons, including that the potential pollutant materials are stored outdoors. The SWPPP fails to include these pollutants as **additional sampling parameters**, in violation of Section XI.B.6.c of the General Permit.

(n)   An appropriate and complete discussion of **drainage areas and Outfalls** from which samples must be taken during Qualified Storm Events (Section XI);

(o)   A discussion of whether the Facility is subject to 40 CFR Subchapter N ELGs; and

(p)   Sample Chain of Custody Form.

Failure to develop or implement an adequate SWPPP is a violation of Sections II.B.4.f and X of the General Permit.

### B.  Failure to Develop, Implement and/or Revise an Adequate Monitoring and Reporting Program Pursuant to the General Permit

Section XI of the General Permit requires Dischargers to develop and implement a storm water monitoring and reporting program ("M&RP") prior to conducting industrial activities. Dischargers have an ongoing obligation to revise the M&RP as necessary to ensure compliance with the General Permit.

The objective of the M&RP is to detect and measure the concentrations of pollutants in a facility's discharge, and to ensure compliance with the General Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations.  An adequate M&RP ensures that BMPs are effectively reducing and/or eliminating pollutants at the Facility, and it must be evaluated and revised whenever appropriate to ensure compliance with the General Permit.

1.  Failure to Conduct Visual Observations and Maintain Required Records/Reports

Section XI.A of the General Permit requires all Dischargers to conduct visual observations at least once each month, and sampling observations at the same time sampling occurs at a discharge location.

Section XI.A.3 required all Dischargers to complete contemporaneous records of all visual observations.  The records at a minimum must include the date, approximate time of the observation, the locations observed, the presence and probable source of any observed pollutants, the name of the person who conducted the observation, and any response actions and/or additional SWPPP revisions necessary to be taken in response to the visual observations.

Section XXI.H provides that Dischargers must produce copies of visual observation records to regulatory agencies upon request; and Section XXI.J.5 provides that Dischargers must retain either paper or electronic copies of visual observation records for at least five (5) years.

EDEN believes that between March 1, 2018 and the present, Champion Home Builders has failed to conduct monthly and sampling visual observations pursuant to Section XI.A of the General Permit and to maintain contemporaneous written Visual Observation Reports confirming that visual observations were conducted.

2.  Failure to Collect and Analyze the Required Number of Storm Water Samples

In addition, EDEN alleges that Champion Home Builders has failed to provide the Regional Water Board with the minimum number of annual documented results of Facility run-off sampling as required under Sections XI.B.2 and XI.B.11.a of Order No. 2014-0057-DWQ, in violation of the General Permit and the CWA.

Section XI.B.2 of the General Permit requires that all Dischargers collect and analyze storm water samples from two Qualifying Storm Events ("QSEs") within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30).

Section XI.C.6.b provides that if samples are not collected pursuant to the General Permit, a proper and accurate explanation must be included in the Annual Report.

As of the date of this Notice, Champion Home Builders has failed to upload into the SMARTS database system the required number of storm water run-off sample analyses for the reporting years 2017-2018, 2019-2020, 2020-2021 and 2021-2022, and has not provided an adequate explanation for its failure to do so.

Furthermore, pursuant to data collected from the National Oceanic and Atmospheric Administration ("NOAA"), there were sufficient storm events occurring near 1720 East Beamer Street in Woodland during Facility operating hours within the reporting years where required stormwater sample collections were missed to have allowed the Facility to collect at least the minimum number of storm water samples required by the General Permit.

3.   Failure to Collect Storm Water Run-Off Samples during Qualified Storm Events

Pursuant to Section XI.B.1 of the General Permit, a Qualified Storm Event (QSE) is a precipitation event that both produces a discharge for at least one drainage area at the Facility and is also preceded by 48 hours with no discharge from any drainage area.

The General Permit defines "drainage area" as the "area of land that drains water, sediment, pollutants, and dissolved materials to a common discharge location."   (Attachment C to General Permit-Glossary)

Champion Home Builders's stormwater runoff sample(s) collected as listed below were not collected during Qualified Storm Events as defined by the General Permit:

| Sample Date |
| --- |
| 3/13/2018 |
| 11/21/2018 |
| 11/27/2018 |
| 12/18/2019 |
| 1/9/2020 |
| 1/4/2021 |
| 1/27/2021 |

4.   <u>Failure to Deliver Storm Water Samples to a Laboratory within 48 Hours of Collection</u>

Pursuant to Attachment H, Section 2 of the General Permit, Dischargers are to deliver storm water runoff samples to a qualified Laboratory within 48 hours of the date and time of physical sampling.  Champion Home Builders's storm water runoff samples listed below were not delivered to the Facility's Laboratory Pace Analytical in that time frame:

| Sample Date | Date Laboratory Received Sample |
|---|---|
|  |  |
| 11/21/2018 | 11/24/2018 |

5.   <u>Failure to Analyze Storm Water Samples for the Correct Parameters</u>

General Permit sections XI.B.6.a and XI.B.6.b require all Dischargers to analyze for the following three parameters, regardless of facility type:  pH, Total Suspended Solids (TSS) and Oil & Grease (O&G).

Section XI.B.6.d of the General Permit requires additional applicable parameters listed in Table 1 of the General Permit (Additional Analytical Parameters), which are related to the facility's Standard Industrial Classification (SIC) code(s).  The Facility's SIC Code is 2451, requiring it to include the following as mandatory sampling parameters COD.

In addition, Section XI.B.6.c of the General Permit requires Dischargers to analyze for any additional parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment contained in the Facility's SWPPP.

The Facility's SWPPP and/or EDEN's investigation confirms that the following additional parameters must be included in the sampling process, as they are associated with the Facility's industrial operations:  Nitrates (N+N), Aluminum, Iron, Chlorine/Chlorinated Acids, Formaldehyde, Sulphates, Ammonia, Calcium, Sytrenes, Total Petroleum Hydrocarbons.

The storm water runoff sample analyses Champion Home Builders uploaded for samples collected on the dates listed below failed to include additional sampling parameters as outlined above.

| |
|---|
| 3/13/2018 |
| 11/21/2018 |
| 11/27/2018 |

| |
|---|
| 1/15/2019 |
| 2/13/2019 |
| 12/11/2019 |
| 12/18/2019 |
| 1/9/2020 |
| 1/4/2021 |
| 1/27/2021 |
| 10/25/2021 |
| 12/13/2021 |
| 3/28/2022 |
| 11/1/2022 |

**C.  *False and Incomplete Reports Submitted to the Water Board***

Section XXI.L of the General Permit provides as follows:

**L. Certification**

Any person signing, certifying, and submitting documents under Section XXI.K above shall make the following certification:

*"I certify under penalty of law that this document and all Attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system or those persons directly responsible for gathering the information, to the best of my knowledge and belief, the information submitted is, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."*

1.       Submittal of Annual Reports Containing False Representations

Champion Home Builders has failed to comply with Sections XVI.A and XXI.L of the General Permit by failing to submit accurate Annual Reports to the Regional Water Board.

On June 30, 2020; July 13, 2021; and July 11, 2022, Champion Home Builders submitted its Annual Reports for the reporting years 2019-2020, 2020-2021 and 2021-22.

Question No. 3 of the Annual Report requests a "Yes" or "No" response to the question: "Did you sample the required number of Qualifying Storm Events during the reporting year for all discharge locations, in accordance with Section XI.B?"  If the Discharger's response is "No", an explanation must be provided in Attachment 1 to the Annual Report.

Champion Home Builders falsely responded "Yes" to Question No. 3 in its Annual Report for the reporting year 2019-20, when in fact it had not sampled the required number of QSEs.

Champion Home Builders responded "No" to Question No. 3 in its Annual Reports for the reporting years 2020-2021 and 2021-22.  EDEN alleges that this response was false in that the reason provided for the failure to collect the required number of stormwater samples was a claim of a lack of available Qualified Storm Events.

EDEN's investigation confirms that there were in fact sufficient Qualified Storm Events (QSEs) occurring near the Facility during or within 12 hours of the start of regular business hours to allow Champion Home Builders to have collected the requisite number of samples.

2.    Incomplete Ad Hoc Monitoring Reporting

During the 2016-17 reporting year, the facility collected and analyze four separate stormwater samples on the following dates:  10-28-2016, 12-9-2016, 2-2-2017, and 2-20-2017. However, Champion Home Builders failed to complete the required Ad Hoc Monitoring Reports reflecting the laboratory report data for the stormwater samples it collected on 10-28-2016, 2-2-2017, and 2-20-2017

### D.   *Deficient BMP Implementation*

Sections I.C, V.A and X.C.1.b of the General Permit require Dischargers to identify and implement minimum and advanced Best Management Practices ("BMPs") that comply with the Best Available Technology ("BAT") and Best Conventional Pollutant Control Technology ("BCT") requirements of the General Permit to reduce or prevent discharges of pollutants in their storm water discharge in a manner that reflects best industry practice, considering technological availability and economic practicability and achievability.

EDEN alleges that Champion Home Builders has been conducting industrial activities at the site without adequate BMPs to prevent resulting non-storm water discharges.  Non-storm water discharges resulting from these activities are not from sources that are listed among the authorized non-storm water discharges in the General Permit, and thus are always prohibited.

Champion Home Builders's failure to develop and/or implement adequate BMPs and pollution controls to meet BAT and BCT at the Facility violates and will continue to violate the CWA and the Industrial General Permit each day the Facility discharges storm water without meeting BAT and BCT.

*Specific BMP Deficiencies*

On March 13, 2012, the Facility was inspected by Rob Muhl of the Regional Water Quality Control Board. During that inspection, Rob Muhl noted the following BMP deficiencies:

- Poor Housekeeping: Plastic and paper trash and debris around drain inlets.
- Unauthorized Non-stormwater Discharges: Drywall/plaster products observed on the ground.

EDEN's recent investigation confirms that the aforementioned BMP deficiencies are continuing to occur at the Facility.

### E. *Discharges In Violation of the General Permit*

Except as authorized by Special Conditions of the General Permit, Discharge Prohibition III(B) prohibits permittees from discharging materials other than storm water (non-storm water discharges) either directly or indirectly to waters of the United States. Unauthorized non-storm water discharges must be either eliminated or permitted by a separate NPDES permit.

Information available to EDEN indicates that unauthorized non-storm water discharges occur at the Facility due to inadequate BMP development and/or implementation necessary to prevent these discharges.

EDEN alleges that the Discharger has discharged storm water containing excessive levels of pollutants from the Facility to its Receiving Waters during at least every significant local rain event over 0.1 inches in the last five (5) years.

EDEN hereby puts the Discharger on notice that each time the Facility discharges prohibited non-storm water in violation of Discharge Prohibition III.B of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

1. Discharges in Excess of Technology-Based Effluent Limitations

The Industrial General Permit includes technology-based effluent limitations, which prohibit the discharge of pollutants from the Facility in concentrations above the level commensurate with the application of best available technology economically achievable

("BAT") for toxic pollutants and best conventional pollutant control technology ("BCT") for conventional pollutants.  (General Permit, Section X.H.)

The EPA has published Benchmark values set at the maximum pollutant concentration levels present if an industrial facility is employing BAT and BCT, as listed in Table 2 of the General Permit.  The General Permit includes "Numeric Action Levels" ("NALs") derived from these Benchmark values; however, the NALs do not represent technology-based criteria relevant to determining whether an industrial facility has implemented BMPs that achieve BAT/BCT. (General Permit, Section I.M. (Finding 62)).

Champion Home Builders's exceedances of Benchmark values identified in the table listed below, indicate that it has failed and is failing to employ measures that constitute BAT and BCT, in violation of the requirements of the Industrial General Permit.   EDEN alleges and notifies Champion Home Builders that its storm water discharges from the Facility have consistently contained and continue to contain levels of pollutants that exceed Benchmark values as listed below.

These allegations are based on the Facility's self-reported data submitted to the Regional Water Board.  Self-monitoring reports under the Permit are deemed "conclusive evidence of an exceedance of a permit limitation." *Sierra Club v. Union Oil,* 813 F.2d 1480, 1492 (9th Cir. 1988).

Champion Home Builders's ongoing discharges of storm water containing levels of pollutants above EPA Benchmark values and BAT- and BCT-based levels of control also demonstrate that it has not developed and implemented sufficient BMPs at the Facility.  EPA Benchmarks are relevant to the inquiry as to whether a facility has implemented BMPs. [*Cal. Sportfishing Prot. Alliance v. River City Waste Recyclers, LLC* (E.D.Cal. 2016) 205 F.Supp.3d 1128; *Baykeeper v. Kramer Metals, Inc.* (C.D.Cal. 2009) 619 F.Supp.2d 914, 925; *Waterkeepers Northern California v. AG Industrial Mfg. Inc.* (9th Cir. 2004) 375 F.3d 913, 919 (concentration levels in excess of EPA benchmarks are evidence supporting the citizen plaintiff's contention that defendant did not have appropriate BMPs to achieve BAT/BCT).]

Champion Home Builders's failure to develop and/or implement adequate BMPs and pollution controls to meet BAT and BCT at the Facility violates and will continue to violate the CWA and the Industrial General Permit each day the Facility discharges storm water without meeting BAT and BCT.

    **2.**   <u>Discharges in Excess of Receiving Water Limitations</u>

In addition to employing technology based effluent limitations, the Industrial General Permit requires dischargers to comply with Receiving Water Limitations.  Receiving Water Limitations found in Section VI of the General Permit prohibit storm water discharges and

authorized non-storm water discharges to surface water that adversely impact human health or the environment.

Discharges that contain pollutants in concentrations that exceed levels known to adversely impact aquatic species and the environment also constitute violations of the General Permit Receiving Water Limitation.

Applicable Water Quality Standards ("WQS") are set forth in the California Toxics Rule ("CTR") and the Regional Basin Plan. Exceedances of WQS are violations of the Industrial General Permit, the CTR, the Basin Plan, any parameter included as an impairment for the Facility's Receiving Waters on the 303(d) listing, and any parameters identified by the Regional Water Board as parameters assigned a total maximum daily load (TMDL).

Industrial storm water discharges must strictly comply with WQS, including those criteria listed in the applicable Basin Plan. (See *Defenders of Wildlife v. Browner*, 191 F.3d 1159, 1166-67 (9th Cir. 1999).)

The Basin Plan establishes WQS for the Sacramento River and its tributaries, including but not limited to the following:

• Waters shall not contain substances in concentrations that result in the deposition of material that cause nuisance or adversely affect beneficial uses.

• Waters shall not contain suspended material in concentrations that cause nuisance or adversely affect beneficial uses.

• Waters shall be free of changes in turbidity that cause nuisance or adversely affect beneficial uses.

• All waters shall be maintained free of toxic substances in concentrations that are lethal to or that produce other detrimental responses in aquatic organisms.

• Surface waters shall not contain concentrations of chemical constituents in amounts that adversely affect any designated beneficial use.

Information available to EDEN indicates that the Facility's storm water discharges contain elevated concentrations of specific pollutants, as listed below. These polluted discharges can be acutely toxic and/or have sub-lethal impacts on the avian and aquatic wildlife in the Receiving Waters. Discharges of elevated concentrations of pollutants in the storm water from the Facility also adversely impact human health. These harmful discharges from the Facility are violations of the General Permit Receiving Water Limitation.

Further, EDEN puts Champion Home Builders on notice that the Receiving Water Limitations are independent requirements that must be complied with, and that carrying out the process triggered by exceedances of the NALs listed at Table 2 of the General Permit does not amount to compliance with the Receiving Water Limitations.  The NALs do not represent water quality-based criteria relevant to determining whether an industrial facility has caused or contributed to an exceedance of a WQS, or whether it is causing adverse impacts to human health or the environment.

Section XX.B of the General Permit provides that when a facility's industrial storm water discharges and/or authorized NSWDs are determined to contain pollutants that are in violation of Receiving Water Limitations contained in Section VI, the Discharger must conduct a facility evaluation to identify pollutant source(s) within the facility that are associated with industrial activity and whether the BMPs described in the SWPPP have been properly implemented, assess its current SWPPP, and certify via SMARTS any additional BMPs identified which are necessary in order to meet the Receiving Water Limitations.

EDEN alleges that from at least January 15, 2019, to the present, Champion Home Builders has been in violation of the Receiving Water Limitations provision of Section VI of the General Permit, as evidenced by its exceedances of the applicable Water Quality Standards set forth in the Regional Basin Plan, indicated below.

Specifically, Champion Home Builders's sample analyses summarized below violate the strict numeric effluent limitations (NELs) established for Sacramento River and Lower Cache Creek Sacramento River.

Further, Champion Home Builders has failed to comply with Section XX.B of the General Permit.  Failure to comply with the additional Water Quality-Based Corrective Action requirements listed in Section XX.B is an additional violation of the General Permit.

The following discharges of pollutants from the Facility have violated Discharge Prohibitions of the General Permit and are evidence of ongoing violations of Effluent Limitations:

| Sample Collection Date | Outfall | Parameter | Sample Analysis Result* |
|---|---|---|---|
| **Reporting Year 2016-17** | | | |
| 10/28/2016 | Discharge Point SW-1 | TSS | 109 |
| 12/9/2016 | Discharge Point SW-2 | TSS | 388 |

60-Day Notice of Intent to Sue
Champion Home Builders
February 16, 2023
Page 17 of 22

| Sample Collection Date | Outfall | Parameter | Sample Analysis Result* |
|---|---|---|---|
| 02/2/2017 | Discharge Point SW-4 | TSS | 45 |
| 02/20/2017 | Discharge Point SW-5 | TSS | 98 |
|  |  |  |  |
| Total Average TSS |  |  | 160 |
| **Reporting Year 2018-19** |  |  |  |
| 01/15/2019 | Discharge Point SW-3 | TSS | 155 |
| **Reporting Year 2021-21** |  |  |  |
| 03/28/2022 | Discharge Point SW-1 | pH | 5.8 SU |
|  |  |  |  |

*All units are listed in milligrams per liter (mg/L), except pH, which is listed in pH units (SU)

Listed below are the EPA Benchmark numeric action levels associated with the parameters, as identified on **Table 2 of the General Permit,** as well as the Maximum Contaminant Levels (MCLs) listed in the **California Code of Regulations, Title 22, Section 64431** (Table 64431-A) and the Water Quality Control Plan (**Basin Plan**) for the **California Regional Water Quality Control Board, Central Valley Regional, Fifth Edition** (Revised May 2018), Basin Plan Table 3-1, Trace Element Water Quality Objectives.

| Parameter | EPA Benchmark Annual NAL | EPA Benchmark NAL instantaneous Value | CV BASIN PLAN Table 3-1 MCL value | CCR Title 22 Section 64431 |
|---|---|---|---|---|
| pH | N/A | >6 or <9 SU | >6.5 or >8.5 | N/A |
| Total Suspended Solids (TSS) | 100 mg/L | 400 mg/L | N/A | N/A |
| Oil & Grease | 15 mg/L | 25 mg/L | N/A | N/A |
| Zinc | .26 mg/L | N/A | .10 mg/L | N/A |
| Copper | .0332 mg/L | N/A | .0056 mg/L | N/A |
| Lead | .262 mg/L | N/A | N/A | .05 mg/L |
| Chemical Oxygen Demand | 120 mg/L | N/A | N/A | N/A |

| Parameter | EPA Benchmark Annual NAL | EPA Benchmark NAL instantaneous Value | CV BASIN PLAN Table 3-1 MCL value | CCR Title 22 Section 64431 |
|---|---|---|---|---|
| (COD) | | | | |
| Biochemical Oxygen Demand (BOD) | 30 mg/L | N/A | N/A | N/A |
| Aluminum | .75 mg/L | N/A | N/A | 1.0 mg/L |
| Iron | 1.0 mg/L | N/A | .30 mg/L | N/A |
| Nitrate + Nitrate Nitrogen | .68 mg/L | N/A | N/A | 45 mg/L |
| Phosphorus | 2.0 mg/L | N/A | N/A | N/A |
| Ammonia | 2.14 mg/L | N/A | N/A | N/A |
| Magnesium | .064 mg/L | N/A | N/A | N/A |
| Arsenic | .064 mg/L | N/A | N/A | N/A |
| Cadmium | .0053 mg/L | N/A | .00022 mg/L | .01 mg/L9i |
| Nickel | 1.02 mg/L | N/A | N/A | N/A |
| Mercury | .0014 mg/L | N/A | N/A | N/A |
| Selenium | .005 mg/L | N/A | N/A | N/A |
| Silver | .0183 mg/L | N/A | .01 mg/L | .05 mg/L |

### F.  Failure to Comply with Exceedance Response Action Requirements

As of July 1, 2015, the date the current General Permit became effective, all Dischargers were in "Baseline status" for all parameters listed in Table 2 of the Permit.   General Permit, Section XII.B.

#### Level 1 ERA Evaluation and Report

Pursuant to Section XII.C of the General Permit, a Discharger's Baseline status for any given parameter changes to "Level 1 status" if sampling results indicate either an annual average or instantaneous NAL exceedance for that same parameter.

Level 1 status commences on July 1 following the Reporting Year during which the exceedance(s) occurred, and the Discharger enters the Exceedance Response Action ("ERA") process.  The ERA process requires the discharger to conduct a Level 1 ERA Evaluation, with the assistance of a Qualified Industrial Storm Water Practitioner ("QISP"), of the industrial pollutant sources at the Facility that are or may be related to the NAL exceedance(s), by October 1 following commencement of Level 1 status.

The Level 1 ERA Evaluation must include the identification of the corresponding BMPs in the SWPPP, as well as any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances and to comply with the requirements of the General Permit.

Based upon the Level 1 ERA Evaluation, the Discharger is required to, as soon as practicable, but no later than January 1 following commencement of Level 1 status, prepare a Level 1 ERA Report.  (Section XII.C.2).  The Level 1 Report must be prepared by a QISP and must include a summary of the Level 1 ERA Evaluation, a detailed description of the necessary SWPPP revisions, and any additional BMPs for each parameter that exceeded an NAL.

The SWPPP revisions and additional BMP development and implementation must also be completed by January 1.  The Level 1 status discharger is required to submit via SMARTs the Level 1 ERA Report certifying that the Level 1 ERA Evaluation has been conducted, and necessary SWPPP revisions and BMP implementation has been completed.  The certification also requires the QISP's identification number, name, and contact information (telephone number, e-mail address) no later than January 1 following commencement of Level 1 status.

A Discharger's Level 1 status for a parameter will not return to Baseline status until a Level 1 ERA Report has been completed, all identified additional BMPs have been implemented, and results from four (4) consecutive qualified storm events that were sampled subsequent to BMP implementation indicate no additional NAL exceedances for that parameter.

### Failure to Submit Level 1 ERA Report

During the 2016-17 reporting year as summarized above, the Facility exceeded the EPA Benchmark NAL for Total Suspended Solids (TSS) of 100 mg/L and was elevated to Level 1 Status on July 1, 2017, pursuant to Section XII.C of the General Permit– Exceedance Response Actions.

Pursuant to Section XII.C.2 of the General Permit, the Facility was required to have a QISP conduct an evaluation of the Facility by October 1, 2017, and to upload a Level 1 ERA Report on or before January 1, 2018.

As of the date of this Notice, EDEN alleges that Champion Home Builders has failed to conduct a Level 1 status evaluation and has also failed to submit a Level 1 ERA report by uploading it into the SMARTS system.

As a result of Champion Home Builders' failure to comply with required Exceedance Response Actions, since July 1, 2017, it has remained in Level 1 Status for TSS, and has been in continuous daily violation of standard conditions of the General Permit.

### G. _Failure to Properly Train Employees/Facility Pollution Prevention Team_

Section X.D.1 of the General Permit requires each Facility to establish a Pollution Prevention Team responsible for assisting with the implementation of the requirements of the General Permit. The Facility is also required to identify alternate team members to implement the SWPPP and conduct required monitoring when the regularly assigned Pollution Prevention Team members are temporarily unavailable (due to vacation, illness, out of town business, or other absences).

Section X.H.f of the General Permit also requires that each Facility ensure that all Pollution Prevention Team members implementing the various compliance activities of the General Permit are properly trained in at least the following minimum requirements: BMP implementation, BMP effectiveness evaluations, visual observations, and monitoring activities. Further, if a Facility enters Level 1 status, appropriate team members must be trained by a QISP.

Based on the foregoing violations, it is clear that Champion Home Builders has not adequately trained its Pollution Prevention Team, in violation of Sections X.D.1 and X.H.f of the General Permit.  Furthermore, the Facility has failed to date to provide training by a QISP to its Pollution Prevention Team after it entered Level 1 status for TSS on July 1, 2017.

Champion Home Builders may have had other violations that can only be fully identified and documented once discovery and investigation have been completed.  Hence, to the extent possible, EDEN includes such violations in this Notice and reserves the right to amend this Notice, if necessary, to include such further violations in future legal proceedings.

## IV.    THE PERSON OR PERSONS RESPONSIBLE FOR THE VIOLATIONS

The individuals and entities responsible for the alleged violations are Skyline Champion Corporation and Champion Home Builders, Inc., as well as the respective corporate officers and employees of the Facility responsible for compliance with the CWA.

## V.    THE DATE, DATES, OR REASONABLE RANGE OF DATES OF THE VIOLATIONS

The range of dates covered by this 60-day Notice is March 1, 2018, to the date of this Notice.  EDEN may from time to time update this Notice to include all violations which may occur after the range of dates covered by this Notice.  Some of the violations are continuous in nature; therefore, each day constitutes a violation.

## VI.    CONTACT INFORMATION

The entity giving this 60-day Notice is:

Central Valley EDEN ENVIRONMENTAL DEFENDERS, LLC
1520 E. Covell Blvd, Suite B5
Davis, CA  95616
(800) 545-7215

**To ensure an expedited response to this Notice, please send all initial communications to the following email address:** responses@edendefenders.org.

## VII.    RELIEF SOUGHT FOR VIOLATIONS OF THE CLEAN WATER ACT

CWA §§ 505(a)(1) and 505(f) provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for un-permitted discharges of pollutants.  33 U.S.C. §§ 1365(a)(1) and (f), §1362(5).

Pursuant to Section 309(d) of the Clean Water Act, 33 U.S.C. § 1319(d), and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4, each separate violation of the Clean Water Act subjects the violator to a penalty for all violations occurring during the period commencing five (5) years prior to the date of the Notice Letter.  **These provisions of law currently authorize civil penalties of $56,460.00 per day, for each violation occurring on or after November 2, 2015.**

In addition to civil penalties, EDEN will seek injunctive relief preventing further violations of the Clean Water Act pursuant to Sections 505(a) and (d), 33 U.S.C. § 1365(a) and (d), declaratory relief, and such other relief as permitted by law.

Lastly, pursuant to 33 U.S.C. § 1365(d), EDEN will seek to recover its pre and post-litigation costs, including all attorneys' and experts' fees and costs incurred in this matter.

### VIII.    CONCLUSION

The CWA specifically provides a 60-day notice period to promote resolution of disputes. EDEN encourages Champion Home Builders's counsel to contact EDEN within 20 days of receipt of this Notice by sending an email to responses@edendefenders.org to initiate a discussion regarding the violations detailed herein and to determine how Champion Home Builders may resolve this matter without the necessity of litigation.

During the 60-day notice period, EDEN is willing to discuss effective remedies for the violations; however, if Champion Home Builders wishes to pursue such discussions in the absence of litigation, it is suggested those discussions be initiated soon so that they may be completed before the end of the 60-day notice period.

If EDEN does not receive a response from Champion Home Builders or its counsel before the expiration of the 60-day notice period, this matter will be transferred to EDEN's litigation counsel.  Thank you.

Sincerely,

*EDEN Environmental Defenders*

Copies to:

Michael Regan, Director, U.S. Environmental Protection Agency, regan.michael@epa.gov
Regional Administrator, U.S. EPA – Region 9
Sarah Rowan:  rowan.sarah@epa.gov  and Laurie Kermish:  kermish.laurie@epa.gov
Eileen Sobeck, State Water Resources Control Board, eileen.sobeck@waterboards.ca.gov
Mayumi Okamoto, State Water Board Office of Enforcement:  Mayumi.Okamoto@waterboards.ca.gov
California Water Boards Stormwater Program, stormwater@waterboards.ca.gov